UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| KENNETH BROOKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:04CV106 TIA |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. §405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**Procedural History**

On May 7, 2002, Plaintiff protectively filed his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, alleging disability beginning October 17, 2001 as a result of problems with his heart, shoulders, neck, arms, hands, knees, and lower back. (Tr. 47-49, 91) Plaintiff's application was denied, and he then requested a hearing by an Administrative Law Judge ("ALJ"). (Tr. 19, 29) On December 2, 2003, Plaintiff testified at a hearing before an ALJ, who subsequently found that Plaintiff was not under a disability in a decision dated January 13, 2004. (Tr. 251-271, 10-18) On June 25, 2004, the Appeals Council denied Plaintiff's request for review. (Tr. 2-4) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

**Evidence Before the ALJ**

At the hearing, plaintiff appeared with counsel. He testified that he was 45 years old,

measured 5 feet 9 inches, and weighed 250 pounds. He had completed nine years of school. Plaintiff was last employed in April 2002 at a sawmill. Plaintiff worked for that company for 4 years. In October 2001, Plaintiff stopped working when he had a heart attack. Plaintiff testified that he underwent successful bypass surgery at Barnes Hospital in St. Louis, Missouri. He returned to work in February 2002 and worked until April 2002. Plaintiff stated that he stopped working because he could no longer perform his job duties. Specifically, Plaintiff testified that he was unable to lift and that when he tried, it would pull on his chest and feel like his chest was coming apart. While working, Plaintiff would lift 300 to 400 pounds at a time. Plaintiff opined that he could lift a gallon of milk. He did not carry in groceries because he could not wrap his arms around things. Plaintiff stated that whenever he exerted himself, he felt an angina-type burning sensation, for which he took a shot of Nitro spray to stop the pain. (Tr. 254-260)

Plaintiff testified that Drs. Dausmann, a family physician, and Voelker, a cardiologist, were treating him. Plaintiff stated that Dr. Voelker had performed a heart catheterization which revealed some blockage. Dr. Voelker told Plaintiff to avoid heavy lifting and exposure to cold and heat. Plaintiff stated that his doctor believed that the medicine would keep Plaintiff's condition stable without the need for surgery. (Tr. 259-260)

Plaintiff also testified to other medical problems aside from his heart problem. He stated that he had arthritis in his hands, knees, and feet. Dr. Dausmann treated Plaintiff for his arthritic condition. Plaintiff testified that he lived at home with his wife and one of his two children. Plaintiff's wife was disabled after suffering from a brain aneurysm. Plaintiff stated that he did not help with the household chores. Vacuuming bothered his back, arms, and hands, and standing up to do dishes hurt his lower back, arms, and shoulders. Plaintiff occasionally helped with the laundry. His wife did all

2

the cooking. However, they grocery shopped together once a month. Plaintiff did not walk through the store but rode a cart instead. He stated that the walking and standing hurt his back. Plaintiff opined that he could walk for about 10 or 15 minutes. Shopping generally took 30 to 45 minutes. Plaintiff carried the grocery bags in, but he testified that he could not carry anything heavier. He testified that he tried to bring in wood but was only able to bring in about one stick. Plaintiff drove a little. However, driving long distances bothered his arms and shoulders. (Tr. 260-263)

Plaintiff also testified that he had problems sitting for long periods. After an hour of sitting, Plaintiff began to hurt. Generally, he sat in a recliner, which he was able to do for two or three hours. Plaintiff listened to the radio, read the newspaper, and visited with his granddaughter. He went to church every couple of weeks. At the time of the hearing, Plaintiff took several different medications. He took Lipitor, Corazepam, Chlorzoxaxone, Paroxetine, Mobic, Isosorbomon, Spironolactone, Metoprolol, Buspirone, Altace, and Nitros. (Tr. 263-266)

Plaintiff testified that he experienced pain in his hands, knees, neck, shoulder, back, and lower back. Doctors informed Plaintiff that arthritis was the cause of his pain. With regard to his hands, Plaintiff stated that he could not straighten or grip with his fingers, nor was he able to lift. Further, he was unable to get down on his knees. Plaintiff experienced this pain, which had become constant, over the last year an a half. He rated the pain as a 7 ½ to 8 on a scale from 1 to 10. Trying to do things around the house such as his chores made the pain worse. The muscle relaxers helped the pain, as did placing a heating pad on his back. Plaintiff believed that the pain would preclude him from working at the sawmill because he could not handle it. (Tr. 267-268)

Plaintiff stated that he used to enjoy deer hunting but that he had not gone the past two years. Plaintiff also had breathing problems when he went outside in the extreme heat or cold. He was

3

unable to climb stairs because of his knee problems. Plaintiff opined that he could walk a hundred yards without a problem. He then had to stop and rest somewhere. He could sit for an hour before he needed to move. After that, Plaintiff would stretch out in the recliner. Plaintiff was able to bend over and touch his knees. He could stoop and get back up, but it was not easy for him. Plaintiff was unable to grip or hold things with his hands due to soreness in his knuckles and joints. He could pick up things that weren't heavy. Plaintiff further testified that his income consisted of his wife's disability check and food stamps. He did receive Medicaid. (Tr. 268-271)

### **Medical Evidence**

On October 17, 2001, Plaintiff was admitted to the Hannibal Regional Hospital with burning pain in his chest and right arm. (Tr. 110-111) Dr. Richard Valuck diagnosed unstable angina; hypercholesterolemia; hypertension; family history of coronary disease; and smoking, which Plaintiff needed to quit. (Tr. 105-107) Plaintiff was transferred to Barnes Hospital on October 19, 2001 for cardiothoracic surgery. (Tr. 103-104) On October 22, 2001, Plaintiff underwent aortocoronary bypass grafting times three, which he tolerated well. Plaintiff was discharged on October 25, 2001 with diagnoses of coronary artery disease; hypertension; degenerative joint disease; and hypercholesterolemia. Plaintiff was to avoid strenuous exercise for four to six weeks and perform no heavy lifting, pushing, pulling more than 5 to 10 pounds, or driving for four weeks. (Tr. 132-152)

On May 7, 2002, Plaintiff complained of chest pain and dyspnea. He underwent a stress test/treadmill study, which revealed negative electrocardiogram and no arrhythmias, hypotension or complications. (Tr. 210-211) A nuclear medicine stress/rest cardiolite imaging test revealed left ventricular cavity size enlargement; decreased wall thickening along inferior wall; reversible myocardial ischemia; and fixed perfusion defect along the inferior wall with suspected myocardial

4

thinning/scar. (Tr. 226) An echocardiogram showed mild concentric left ventricular hypertrophy; mild enlargement of the left ventricle with preserved systolic function; diastolic dysfunction of the left ventricle; aortic root mildly enlarged; trace tricuspid regurgitation and trace pulmonic regurgitation, which was a normal variant in the general population; trace to mild mitral regurgitation; normal right ventricular systolic pressure; no evidence of pulmonary hypertension; and no mass, thrombus, or vegetation. (Tr. 208-209) An ultrasound of Plaintiff's legs demonstrated elevated ABIs with no evidence of occlusive vascular disease. (Tr. 227)

On May 10, 2002, Plaintiff saw Dr. Gary W. Dausmann for complaints of pain in his neck, shoulders, hands, hips, and knees. Plaintiff reported that he had performed physical labor for over 30 years and that he was becoming more sore and stiff. Dr. Dausmann noted mild tenderness posterior over Plaintiff's neck. Review of the extremities revealed mild tenderness over the interphalangeal joints and metacarpal phalangeal joints and mild tenderness about both knees. Dr. Dausmann assessed arthritis and prescribed Celebrex. (Tr. 162)

Plaintiff went to the emergency room with complaints of chest pain and shortness of breath on June 1, 2002. He was discharged in stable condition with a diagnosis of acute dyspnea. (Tr. 174-175)

On June 3, 2002, Plaintiff followed-up with Dr. Donald Voelker. The next day, Plaintiff underwent a cardiac catheterization. Dr. Voelker's impressions were severe right coronary disease with adequate filling of saphenous vein graft to the distal series of vessels, which were very small; excellent left internal mammary artery to the LAD with excellent flow; mid LAD one percent occluded; left circumflex heavily diseased with excellent filling of the distal vessel; and essentially normal left ventricular ejection fraction. He recommended optimization of Plaintiff's medical therapy

to relieve symptoms. Specifically, Dr. Voelker added Imdur and increased Plaintiff's dosage of Lipitor. Plaintiff was discharged in no distress and able to ambulate and care for himself. He restricted Plaintiff's lifting to no more than 20 pounds for three days. (Tr. 200-203)

Plaintiff saw Dr. Dausmann on June 6, 2002 and reported that the Celebrex was not helping the arthritis in his hands, feet, and ankles. Dr. Dausmann noted mild tenderness in Plaintiff's hands and left foot. He changed Plaintiff's medication to Bextra. (Tr. 161)

On October 2, 2002, Plaintiff presented to the emergency room, complaining of chest pain. Plaintiff was given Nitro and was discharged in improved condition. (Tr. 195-198)

The following day, Plaintiff saw Dr. Voelker for complaints of angina, dyspnea, and numbness in his hands, left more than right. Specifically, Plaintiff reported burning pain in the center and right side of his chest, which lasted for 10 minutes. Stress aggravated his condition, but Nitro relieved the pain. Plaintiff also reported that the pain radiated to both arms and included shortness of breath, nausea, and diaphoresis. These episodes occurred once a week. In addition, Plaintiff complained of shortness of breath when walking 120 yards or climbing 1-2 flights of stairs. Plaintiff also experienced orthopnea, which required the use of two pillows, and occasional ankle swelling. Upon examination, Dr. Voelker noted that Plaintiff was not in obvious distress. His musculoskeletal exam revealed no arthritis, joint swelling, or deformity. Dr. Voelker also noted that Plaintiff was depressed and anxious. He diagnosed arteriosclerotic heart disease; hypertension; angina; dyspnea; claudication; vertigo; fatigue; depression; anxiety; and hypercholesterolemia. Dr. Voelker recommended that Plaintiff maximize medical management; quit smoking; make lifestyle changes; either enroll in a rehabilitation program or exercise baseline treadmill; and lose weight. He prescribed medication and recommended further tests, along with a follow-up appointment with Dr. Dausmann. (Tr. 192-194)

6

On December 16, 2002, Plaintiff returned to Dr. Dausmann. Plaintiff reported that he had been fairly stable without significant chest discomfort except with very strenuous work. Plaintiff was doing well with his hypercholesterolemia, arthritis, and back spasms. Dr. Dausmann assessed coronary artery disease, stable; status post CABG; and hypercholesterolemia. He recommended that Plaintiff continue his medications and return in 3 months. (Tr. 160)

On January 9, 2003, Dr. Dausmann completed a form regarding Plaintiff's conditions. Dr. Dausmann opined that Plaintiff's primary disabling conditions were coronary artery disease, hypercholesterolemia, arthritis, and angina. He listed Plaintiff's prognosis for return to his usual occupation as "poor," opining that Plaintiff was totally disabled for his occupation and for any gainful work. Further, Dr. Dausmann believed that Plaintiff could never return to his regular occupation or any other occupation. He did not feel that Plaintiff was a good candidate for vocational rehabilitation. (Tr. 246)

Plaintiff reported muscle spasm and right knee discomfort to Dr. Dausmann on January 16, 2003. Dr. Dausmann assessed arthritis and muscle spasm of the back. He prescribed Flexeril after Plaintiff reported continued pain with Bextra. (Tr. 159) On February 6, 2003, Plaintiff reported much relief with the Flexeril. Examination revealed no neck tenderness or spasm of the lower back. Dr. Dausmann assessed muscle spasm secondary to underlying arthritis, which were improved. He recommended that Plaintiff continue taking Flexeril on a per needed basis. On March 20, 2003, Plaintiff complained of hypercholesterolemia, which was doing well. He continued to report muscle spasms in his back and neck. Plaintiff further stated that the Flexeril had not helped. Physical examination was normal, except for some mild tenderness in the lower back and neck area. Dr. Dausmann assessed hypercholesterolemia, controlled, and muscle spasms. He prescribed Skelaxin.

(Tr. 157)

During a follow-up visit with Dr. Dausmann on April 30, 2003, Plaintiff reported doing and feeling well, with no chest pain or new complaints. Dr. Dausmann assessed hypertension, controlled; hypercholesterolemia, stable; and coronary artery disease, stable. He recommended that Plaintiff continue his current medications. (Tr. 156) On June 11, 2003, Plaintiff reported that he rarely experienced chest pain. His other conditions were stable. Plaintiff complained of some pain in his knees, and the examination revealed mild tenderness about the right knee. Dr. Dausmann prescribed Mobic for Plaintiff's arthritis of the knees. (Tr. 155)

On June 19, 2003, Plaintiff complained of being lightheaded, numbness in his hands, burning sensation in right arm radiating to chest, shortness of breath, and soreness around the sternum incision site. The physician recommended further evaluation of Plaintiff's sternum. (Tr. 212) On June 26, 2003, Plaintiff underwent an exercise test, a myocardial perfusion scan, and diagnostic imaging. The exercise test revealed no ischemia, no arrythmias, and symptoms of moderate chest pain. (Tr. 189) The myocardial perfusion scan revealed a small area of reversibility apparently representing ischemia and mild hypokinesis at the apex. (Tr. 218) While the diagnostic imaging report revealed no evidence of acute cardiopulmonary process, the lateral view of the lowest wire suture was either broken or not tied the same as the other sutures. (Tr. 230)

On June 30, 2003, Plaintiff was feeling well with no new complaints. Plaintiff reported that the Mobic did not help his arthritis but that the Chlorzoxazone helped considerably. Dr. Dausmann assessed hypercholesterolemia, controlled; coronary artery disease, stable; and arthritis and muscle spasm. He prescribed Chlorzoxazone for the arthritis and BuSpar for complaints of anxiety. (Tr. 154) On August 11, 2003, Plaintiff reported that the Chlorzoxazone relieved his muscle spasms, and

the BuSpar helped his anxiety. Dr. Dausmann assessed stable arthritis and improved anxiety. (Tr. 250) On September 22, 2003, Plaintiff complained of knots on his right thumb and right long finger. Dr. Dausmann referred Plaintiff to orthopedics. (Tr. 248)

## The ALJ's Determination

In a decision dated January 13, 2004, the ALJ determined that Plaintiff met the requirements for a period of disability and Disability Insurance Benefits and was insured for benefits through the date of the decision. Plaintiff had not engaged in substantial gainful activity since the alleged onset date. Further, the ALJ found that Plaintiff had a combination of severe impairments that did not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Plaintiff did not have a severe mental impairment. His allegations regarding his limitations were generally credible. The ALJ also noted that he considered all of the medical opinions contained in the record regarding the severity of Plaintiff's impairments. The ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform the full range of sedentary work but was unable to perform any of his past relevant work. Based on this RFC, Plaintiff's younger age, limited education, and work experience, the ALJ relied on the Medical-Vocational Guidelines to determine that Plaintiff was not disabled. Further, Plaintiff's capacity for sedentary work was not compromised by nonexertional limitations. Therefore, the ALJJ concluded that Plaintiff was not under a disability at any relevant time through the date of the decision. (Tr. 16-17)

Specifically, the ALJ noted Plaintiff's testimony regarding his impairments and limitations. The ALJ found that Plaintiff had limitations in walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling. While Plaintiff could perform these activities, he could do so for short periods of time and with little weight. Plaintiff had no limitations in mental functioning. The

9

ALJ found that Plaintiff's severe impairments included coronary artery disease status post bypass surgery, angina, and degenerative joint disease. (Tr. 11-12)

The ALJ noted Plaintiff's medical history beginning with his heart attack in 2001. Specifically, he found that Dr. Dausmann's opinion that Plaintiff was disabled was inconsistent with the limitations in the record and did not contain sufficient information. Further, the ALJ found that Plaintiff's allegations of symptoms precluding all work were inconsistent with the evidence and were not credible. While Plaintiff could not perform his past relevant work, the ALJ relied on the Medical-Vocational Guidelines to determine that Plaintiff could perform the full range of sedentary work and was thus not disabled. (Tr. 14-16)

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a). To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902

F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## Discussion

Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC because he failed to rely on substantial medical evidence, erred in assessing Plaintiff's credibility, and erred in applying the Medical-Vocational Guidelines. The Defendant, on the other hand, asserts that the ALJ properly evaluated the medical opinions and the Plaintiff's credibility. Further, Defendant contends that substantial evidence supports the ALJ's RFC determination and his use of the Medical-Vocational Guidelines.

The undersigned finds that the ALJ failed to properly assess Plaintiff's credibility under Eighth Circuit law, and therefore, the case should be remanded for further proceedings. As Defendant acknowledges, the ALJ is required to make express credibility determinations setting forth his reasons for discrediting Plaintiff's complaints. Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000). The ALJ

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimant's functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

may disbelieve Plaintiff's subjective complaints based on inconsistencies in the evidence as a whole; however, "he must give reasons for discrediting the claimant." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citation omitted). The ALJ is not required to explicitly discuss each Polaski factor. Id. (citation omitted). "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." Id. (citation omitted).

In the instant case, the ALJ set forth the Polaski factors in his opinion. He also stated that he gave full consideration to Plaintiff's subjective complaints. The ALJ failed, however, to explicitly discount those complaints, setting forth the reasons for discrediting the Plaintiff. The ALJ discussed only some of the medical evidence and Plaintiff's work history. Nowhere did the ALJ give specific reasons for discrediting the Plaintiff's subjective complaints, which the ALJ found would demonstrate an inability to work if the complaints were fully credible. (Tr. 14) While the opinion articulated some of the evidence and claimed that the ALJ considered all the evidence in making assessments, the decision is simply void of analysis. As previously stated, the ALJ must give reasons for discrediting a plaintiff. Strongson, 361 F.3d at 1072. See also Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (courts will not disturb a decision where the ALJ considers, "'but for good cause expressly discredits,'" a plaintiff's allegations of disabling pain) (quoting Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001)). The ALJ's decision is conclusory, and, as such, is not supported by substantial evidence. Therefore, this case will be remanded to the ALJ for further analysis.

On remand, the ALJ should also contact Plaintiff's physician(s) for further clarification of Plaintiff's limitations. "[I]t is the ALJ's duty to develop the record fully and fairly[,]" which includes ensuring that the record contains evidence from treating and examining physicians addressing the impairments at issue. Strongson, 361 F.3d at 1071-1072 (citations omitted). The ALJ discredited

13

Dr. Dausmann's opinion that Plaintiff was disabled, but then acknowledged that the opinion did not give sufficient information. "If the ALJ did not believe . . . that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [Plaintiff's] . . . impairments limited his ability to engage in work-related activities." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citing Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). The case will therefore be remanded to the ALJ for further consideration consistent with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and this case be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

s/Terry I. Adelman

TERRY I. ADELMAN
UNITED STATES MAGISTRATE JUDGE

Dated this  18th  day of October, 2005.